# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

| | |
|---|---|
| JOE COOK and JANE COOK, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 11-4006-NKL |
| | ) |
| DOUBLE R PERFORMANCE, INC. and | ) |
| PETER ROBERTS, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## ORDER

Before the Court is the Motion to Dismiss [Doc. # 8] filed by Defendants Double R Performance, Inc. ("Double R"), and Peter Roberts ("Roberts"). For the following reasons, the Court denies the motion.

## I.     Background

Missouri residents Joe and Jane Cook bring this action against Canadian residents Double R and Roberts. Plaintiffs' Complaint alleges the following.

### A.     Plaintiffs' Purchase of Catastrophe

In the fall of 2009, Plaintiffs decided that they wanted to purchase a catamaran-styled speed boat for their personal use. In November 2009, Plaintiffs discovered that Defendant Double R was offering for sale a 42-foot Nortech catamaran boat named Doublewide Catastrophe ("Catastrophe") listed at $304,000.

In January 2010, Plaintiffs called Defendant Roberts, an agent of Defendant Double R, to obtain more information regarding Catastrophe. Roberts represented that Double R had sold the boat new in Canada, performed all of the service work for the boat's two prior owners, and had housed and maintained the boat at his dealership throughout its history. In that initial telephone conversation, Roberts also represented that he knew Catastrophe well and that it had never been run in salt water. Roberts represented that the closest the boat had ever come to salt water was during a Poker Run race in a New York state river.

In the initial telephone conversation, Plaintiffs asked Roberts about the condition of the two Mercury 1075 engines that were installed on Catastrophe, and Roberts represented that the engines had been run 50 and 56 hours respectively since being "refreshed" by Mercury Marine at its Fond du Lac Wisconsin headquarters. Under the Mercury Marine "factory refresh" program, Mercury Marine overhauls the engine to specifications and provides a new-engine warranty. The factory-recommended time interval for refreshing Mercury Marine 1075 engines is between 100 and 110 hours, because if this type of high-performance engine is run longer than that, there is a substantial risk of catastrophic failure. The cost of having a Mercury Marine 1075 engine refreshed at the Mercury Marine performance engine shop in Fond du Lac, Wisconsin, is at least $25,000, but the cost can be substantially more if anomalies or defective parts are discovered during the overhaul process. The Mercury Marine 1075 engine costs $104,000 new.

In an effort to investigate Defendants' reputations, Plaintiffs contacted Terry Sobel, the owner of Catastrophe's manufacturer Nortech boats, and were informed that Double R

2

and Roberts were reputable dealers. Plaintiffs also contacted Matthew Smith, owner of Performance Boat Brokerage ("Performance Boat") of Camdenton, Missouri. Smith confirmed that Roberts and Double R were well known in the industry and were reputable dealers.

Plaintiffs telephoned Defendant Roberts several more times, each time questioning him about the hours on each of the Mercury Marine 1075 engines. Each time Roberts told Plaintiffs that the engines had 50 and 56 hours respectively since going through the Mercury Marine refreshment program at the factory.

In reliance upon the representations made by Defendants Roberts and Double R, regarding the condition of the boat and engines, Plaintiffs struck an agreement to purchase Catastrophe for $302,900, delivered to Camdenton, Missouri. The terms of the agreement were that Plaintiffs would pay a deposit of $10,000, a trade-in allowance of $104,900 for Plaintiff Joe Cook's boat, with the balance of $188,000 due upon delivery.

In February 2010, Defendant Roberts personally delivered Catastrophe to Plaintiffs at Performance Boats in Camdenton, Missouri. When the shrink wrap was removed from the boat upon delivery, the condition of the exterior paint and interior of the boat was nothing like Defendants Double R and Roberts had represented it to be. The paint was scratched and damaged, the exterior and interior of the boat were filthy, and stress cracks were in evidence on the bottom of the boat. Local technicians from Performance Boat examined Catastrophe and gave the Plaintiffs an estimate to refurbish the paint and finish.

Performance Boat technicians also positioned the trailer so that the stern of the boat was in an unfrozen portion of the lake for the purpose of attempting to start the two engines. Initially, the engines would not start because the batteries were dead. After a charge was placed on the batteries, the engines started but the impellers were defective and would not pump cooling water through the engines.

At a breakfast meeting with Plaintiffs the next morning, Defendant Roberts agreed to reduce the price by $7,500 as a credit for the deteriorated cosmetics and paint. Defendant Roberts further agreed to send Plaintiffs new impellers. Plaintiffs agreed to purchase Catastrophe and signed the Purchase Agreement. On the second page of the Purchase Agreement appears the following text in small print: "<u>Buyer certifies that he/she has read the Terms and Conditions on the back of this document and agrees that they shall be incorporated as part of this Agreement</u>." [Doc. # 8, Ex. A at 2.] The Terms and Conditions include the following language in exceedingly fine print: "This Agreement and the affairs of the parties shall be governed by the laws of the Province of Ontario and the venue for any legal dispute shall be the jurisdiction in which Dealer is located." [Doc. # 8, Ex. B.]

**B.** **Events Following Plaintiffs' Purchase of Catastrophe**

After delivery of Catastrophe, Plaintiff Joe Cook and Matthew Smith ran the boat for approximately 20 minutes and discovered a trim pump leaking on one of the drives which was repaired. Performance Boat then completed the painting and detailing of the boat. Performance Boat discovered that the propellers required rebuilding, and sent them to the manufacturer only to learn that one of the pillars was beyond repair and had to be replaced

at a cost to Plaintiffs of $5,250. Defendants Roberts and Double R had agreed to furnish the majority of the paint and the paint codes to Performance Boat in connection with the repainting work that had to be done, but Defendants never provided either. Performance Boat also contacted Roberts and Double R to obtain the promised service records on the engines, but Defendants never provided any such records.

In April 2010, Plaintiff Joe Cook drove Catastrophe to Plaintiffs' house from the boat ramp. Upon reaching Plaintiffs' dock, Joe Cook and his friend and insurance agent, Christopher White, took Catastrophe out for its first run. After a 25 minute ride, Plaintiff Joe Cook and Christopher White brought Catastrophe back into the cove en route to the boat dock. While coming into the cove toward the dock, the port engine quit running and locked up.

Plaintiff Joe Cook placed a call to Performance Boat, and David Place, an experienced Mercury Marine technician, went to Plaintiffs' home to inspect the engine. Place discovered oil coming from the breather and confirmed that the engine was completely locked up. The next day, Place returned to Plaintiffs' dock to conduct a more detailed inspection of the engine. He confirmed that the port engine was locked up to the point where it could not even be turned by hand, and that oil had blown out the back breather as the result of internal engine pressure. Place connected a computer to the port and starboard engines and discovered that the onboard recording devices indicated a total time of 170 and 176 hours, respectively on the engines. Place advised Plaintiff Joe Cook that the port engine was "fried."

The Mercury Marine-certified mechanics at Performance Boat removed the engines and began to disassemble them for inspection. When the frozen port engine (Mercury Marine serial number ending in 621) was disassembled, the Performance Boat technicians observed water spilling from the cylinder heads. The cylinder heads and other internal parts were badly corroded from exposure to salt water, and all of the gaskets had decayed. The engine had locked up due to the massive internal corrosion from exposure to salt water and excessive wear of outdated parts.

The mechanics at Performance Boat determined that virtually all of the parts in engine 621 were original parts as indicated from the date stamps on the parts. Performance Boat took the disassembled engines to H & M Machine Shop for further inspection. Randy Hodge, the owner of H & M Machine Shop, confirmed that salt water had gotten into the engine 621 corroding cylinder walls, damaging bearings and corroding the cylinder heads. Hodge determined that any representation made by Defendants that engine 621 had 50 and 56 hours since being refreshed by Mercury Marine was false, because all of the lower end engine parts were original, and because the wear and corrosion found in the cylinder walls, bearings, and excessive cylinder head damage demonstrated that no service had been performed on engine 621, much less a Mercury Marine factory refresh. The wear exhibited by the engine parts indicated that the parts in engine 621 had been run for hundreds of hours, perhaps as many as 500 hours.

 **C.** **Events in the Years Prior to Plaintiffs' Purchase of Catastrophe**

Plaintiffs further allege that in December 2006 – years before they purchased Catastrophe – FastBoats.com of Palm Beach, Florida, sent two Mercury Marine 1075 engines (serial numbers ending in 046 and 621) to the Mercury marine factory refresh shop in Fond du Lac, Wisconsin. Mercury Marine discovered that the engine block and cylinder heads on engine 621 were unserviceable due to the fact that water in the engine had frozen, cracking the block and damaging the cylinder heads. Mercury Marine therefore contacted FastBoats.com and obtained authorization to rebuild engine 621 utilizing a new engine block and new cylinder heads.

Mercury Marine completed the refresh of the two engines in early January 2007. Mercury Marine then shipped the two refreshed engines back to FastBoats.com. Mercury Marine at the same time also shipped the damaged engine block and cylinder heads from the original engine 621, together with assorted parts removed from engine 621 and engine 046. When Mercury Marine rebuilt original engine 621, the new cylinder block was stamped by Mercury Marine with the original 621 serial number. What this meant is that two engine blocks bearing serial number ending in 621 were returned to FastBoats.com, where one of the engine blocks stamped 621 contained the refreshed engines and the other block stamped 621 was the original damaged engine block. At some later date, the unusable engine block bearing the serial number 621 was repaired by FastBoats.com and used to create a completed engine using various parts, some of which were the original parts removed by Mercury Marine after determining that the original engine block 621 could not be re-used in the refresh process. Sometime prior to October 2009, Catastrophe and several Mercury 1075

engines were acquired by Defendants Roberts and Double R, including the counterfeit engine 621 created by FastBoats.com using the original damaged engine block 621 and assorted parts.

    **D.    Plaintiffs' Claims**

Plaintiffs assert five separate causes of action. Count I alleges violations of the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. §§ 4-7.020 and 407.025. Count II asserts a claim for fraud in the inducement of the contract. Count III asserts a claim for common law fraud. Count IV asserts a claim for negligent misrepresentation. Finally, Count V asserts a claim for unjust enrichment.

As a direct and proximate result of Defendants' conduct, Plaintiffs allege that they have suffered damages in the following amounts: $302,900 for a boat that they have never been able to use; $21,769.18 for hull refurbishment and to repair and replace defective propellers; $9,800 for insurance on Catastrophe for a boat that they have never been able to use; $14,000 to renovate their dock and $5,500 for a new boat lift to accommodate Catastrophe which they have never been able to use; $79,127.98 to Performance Boat for repairs and reinstallation of the engines on Catastrophe; $5,250 to replace damaged and unserviceable propellers that were on the boat at the time of delivery; $4,400 for new cylinder heads to replace damaged and unserviceable cylinder heads that were on the boat at the time of delivery; and approximately $25,000 for the loss of use and enjoyment of Catastrophe for one entire boating season.

**II.    Discussion**

Defendants Double R and Peter Roberts now move the Court to dismiss Plaintiffs' claims pursuant to Rule 12(b)(3) due to improper venue, or, alternatively, pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Both of Defendants' arguments rely on the forum selection clause in the Terms and Conditions incorporated into the Purchase Agreement, and Defendants state that their alternative Rule 12(b)(6) theory is presented only out of an abundance of caution.

The Court finds persuasive caselaw cited by Defendants indicating that the majority rule is that Rule 12(b)(3) is the proper vehicle for seeking enforcement of a forum selection clause on a motion to dismiss. *See Tockstein v. Spoeneman*, No. 4:07-CV-00020-ERW, 2007 WL 3352362 *1, *3 (E.D. Mo. Nov. 7, 2007). The Court will treat Defendants' motion to dismiss for lack of jurisdiction based on the forum selection clause as a motion under Rule 12(b)(3) to dismiss due to improper venue.

The forum selection clause provides: "This Agreement and the affairs of the parties shall be governed by the laws of the Province of Ontario and the venue for any legal dispute shall be the jurisdiction in which Dealer is located." [Doc. # 8, Ex. B.] Defendants represent, and Plaintiffs do not dispute, that the sole location of "Dealer" is the Double R facility in Ontario, Canada. Defendants argue that all of Plaintiffs' claims arise from the sale of Catastrophe and from alleged representations in connection with that sale. Therefore, Defendants assert, the exclusive venue for this dispute is in Ontario, Canada.

The Court reads the language of the forum selection clause as unambiguously broad, extending to "any legal dispute" between the parties. If the forum selection clause is

enforceable, it appears that the exclusive venue for this dispute would be in Ontario, Canada. *See Terra Int'l, Inc. v. Mississippi Chem. Corp.*, 119 F.3d 688 (8th Cir. 1997) (applying forum selection clause to tort claims).

"[A] forum selection clause is enforceable unless it is invalid or enforcement would be unreasonable and unjust." *Marano Enters. of Kan. v. Z-Teca Rests.,* 254 F.3d 753, 757 (8th Cir. 2001) (quoting *Dominium Austin Partners v. Emerson*, 248 F.3d 720, 726 (8th Cir. 2001)); *accord High Life Sales Co. v. Brown-Forman Corp.*, 823 S.W.2d 493, 497 (Mo. 1992) ("By this opinion, we join the better-reasoned majority rule and will enforce [forum selection] clauses, so long as doing so is neither unfair nor unreasonable.") (citing *M/S Bremen, GMBH v. Zapata Off–Shore Co.*, 407 U.S. 1 (1972)).

In *Rainforest Café, Inc. v. Eklecco, LLC*, the Eighth Circuit recognized that it remains an open question whether federal or state law governs the determination of what effect to give forum selection clauses in diversity cases such as this. 340 F.3d 544, 546 (8th Cir. 2003) (citing *M.B. Rests., Inc. v. CKE Rests., Inc*., 183 F.3d 750, 752 n. 4 (8th Cir. 1999)). As in *Rainforest Café*, it appears that the outcome in this case would remain the same regardless of whether federal or state law is applied to the forum selection clause. *Id.*

The Eighth Circuit's *Dominium Austin Partners* and the Missouri Supreme Court's *High Life Sales Company* both state the same rule – that a valid forum selection clause is enforceable unless it would be unreasonable and unjust – and both cases trace that rule to the U.S. Supreme Court's decision in *M/S Bremen, GMBH v. Zapata Off–Shore Co*. *Dominium*

*Austin Partners,* 248 F.3d at 726; *High Life Sales Co*., 823 S.W.2d at 496-97. Thus, Chief Justice Burger's reasoning in *Bremen* provides important guidance:

> There are compelling reasons why a freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power, such as that involved here, should be given full effect. In this case, for example, we are concerned with a far from routine transaction between companies of two different nations contemplating the tow of a extremely costly piece of equipment from Louisiana across the Gulf of Mexico and the Atlantic Ocean, through the Mediterranean Sea to its final destination in the Adriatic Sea. . . . It cannot be doubted for a moment that the parties sought to provide for a neutral forum for the resolution of any disputes arising during the tow. . . . There is strong evidence that the forum clause was a vital part of the agreement, and it would be unrealistic to think that the parties did not conduct their negotiations, including fixing the monetary terms, with the consequences of the forum clause figuring prominently in their calculations. Under these circumstances, as Justice Karminski reasoned in sustaining jurisdiction over Zapata in the High Court of Justice, "(t)he force of an agreement for litigation in this country, freely entered into between two competent parties, seems to me to be very powerful."
>
> Thus, in the light of present-day commercial realities and expanding international trade we conclude that the forum clause should control absent a strong showing that it should be set aside. . . . The correct approach would have been to enforce the forum clause specifically unless Zapata could clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching. Accordingly, the case must be remanded for reconsideration.

407 U.S. 1, 13-15 (footnotes omitted).

The facts in the instant case are nearly the opposite of those in *Bremen*. Unlike in *Bremen*, the agreement at issue here does not appear to have been "unaffected by fraud, undue influence, or overweening bargaining power" nor freely negotiated between equally sophisticated business entities. *Id.* at 12. Both parties did not seek "to provide for a neutral forum for the resolution of disputes," since Joe and Jane Cook signed an adhesive contract

presented to them by the merchant Defendants, providing that all disputes would be adjudicated in Ontario, Canada, where Defendants reside. *Id.* at 13. Nor is there strong evidence that the forum selection clause was a vital part of the agreement. Here, it seems most likely that "the parties did not conduct their negotiations, including fixing the monetary terms, with the consequences of the forum clause figuring prominently in their calculations." *Id.* at 14. Indeed, it appears from the Complaint that the monetary terms were fixed well before Plaintiffs were presented with Defendants' adhesive contract.

Plaintiffs have made a strong showing that enforcement of the forum selection clause in this case would be unjust and unreasonable. The Missouri Supreme Court explained in *High Life Sales Company*:

> Many courts have refused to enforce a forum selection clause on the grounds of unfairness if the contract was entered into under circumstances that caused it to be adhesive. An adhesive contract is one in which the parties have unequal standing in terms of bargaining power (usually a large corporation versus an individual) and often involve take-it-or-leave-it provisions in printed form contracts. . . .
>
> Another factor that mitigates in favor of the fairness of enforcing this forum selection clause is the neutral and reciprocal nature of this particular clause. Rather than providing one particular venue where all litigation shall be brought, this clause provides that the litigation shall be brought at the principal place of business of the defendant. Thus, under this clause if Brown–Forman files the lawsuit, the venue would be in Missouri, but if High Life files a lawsuit, the clause calls for it to be filed in Kentucky. Not only does the reciprocal nature of this clause favor its enforcement, but public policy also should favor such a clause because it discourages hasty litigation. . . .

823 S.W.2d at 497 (citations omitted).

Again, the facts here are essentially the opposite of those above. Here, the contract was adhesive, and the forum selection clause was neither neutral nor reciprocal. [Doc. # 8, Ex. B.] Joe and Jane Cook signed a printed form contract presented to them by the merchant Defendants, providing that all disputes would be adjudicated in Ontario, Canada, where Defendants reside.

The forum selection clause here is unjust and unreasonable not merely because of the significant inconvenience of the designated forum, but also because of the clause's one-sidedness and adhesive nature. *Cf. Servewell Plumbing, LLC v. Federal Ins. Co.*, 439 F.3d 786, 790 (8th Cir. 2006) (mere inconvenience to a party is an insufficient basis to defeat an otherwise enforceable forum selection clause). Taking these considerations together with the taint of fraud and the centrality of the MMPA and common law tort claims to Plaintiffs' Complaint – rather than contractual claims, of which there are none – enforcement of the forum selection clause in this case would be unjust and unreasonable. *See Farmland Indus. v. Frazier-Parrott Commodities, Inc.*, 806 F.2d 848, 851 (8th Cir. 1986) ("the person defrauded can not be held to the contractual forum selection clause"), *abrogated on other grounds by Lauro Lines S.R.L. v. Chasser*, 490 U.S. 495 (1989); *11500, LLC v. Cummings*, No. 08-6061-CV-FJG, 2008 WL 4681371, *1, *3 (W.D. Mo. Oct. 22, 2008) ("Forum selection clauses have been held to not apply to claims based on schemes to defraud that began before the contract was executed.") (citations omitted).

### III. Conclusion

Accordingly, it is hereby ORDERED that the Motion to Dismiss [Doc. # 8] filed by Defendants Roberts and Double R is DENIED.

                                                                       s/ Nanette K. Laughrey
                                                                       NANETTE K. LAUGHREY
                                                                       United States District Judge

Dated: May 16, 2011
Jefferson City, Missouri